IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| DRIFTLESS WATER DEFENDERS<br><br>Plaintiff,<br><br>v.<br><br>AGRI STAR MEAT & POULTRY, LLC<br><br>Defendant. | Case No.: 2:25-cv-1007<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES |

1. Plaintiff Driftless Water Defenders ("DWD") brings this action against Defendant Agri Star Meat & Poultry, LLC ("Agri Star") for Agri Star's past and continuing violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* ("Clean Water Act" or "CWA") at Agri Star's beef and poultry slaughterhouse in Postville, Iowa ("Postville Facility"). Agri Star has discharged and continues to discharge pollutants to Hecker Creek, a tributary of the Yellow River, in violation of Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311, 1342. Agri Star has violated and will continue to violate the CWA and the terms and limitations of its National Pollutant Discharge Elimination System ("NPDES") Permit No. IA0375102 (the "NPDES Permit"), issued under the CWA by the Iowa Department of Natural Resources ("IDNR").

2. DWD and its members are harmed by Agri Star's CWA violations that pollute Hecker Creek and the Yellow River, and adversely impact human health, the environment, and aquatic life. As authorized by the CWA's citizen suit provision, Section 505 of the CWA, 33 U.S.C. § 1365(a), DWD seeks declaratory and injunctive relief, civil penalties, litigation costs and fees, and other relief that the Court deems proper to remedy Agri Star's violations of the CWA.

1

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 33 U.S.C. § 1365(a) (CWA citizen suit provision).

4. In compliance with Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), and its implementing regulations, 40 C.F.R. §135.2(a)(1) & (b), on December 23, 2024, DWD served notice of the violations and its intent to file suit in letters addressed to the Defendant, the U.S. Environmental Protection Agency ("EPA"), the Regional Administrator for EPA Region 7, the Attorney General of the United States, and the Director of Iowa's water pollution control agency, the Iowa Department of Natural Resources ("IDNR"). Service was accomplished by Certified Mail, return receipt requested. A copy of DWD's Notice of Intent to Sue is attached hereto as Exhibit A ("Notice Letter").

5. More than sixty (60) days have passed since the Notice Letters were sent. On information and belief, neither EPA nor IDNR has commenced or diligently prosecuted a civil or criminal action to redress Agri Star's violations of the CWA, as identified in the Notice Letter. Moreover, neither EPA nor IDNR has commenced an administrative penalty action under Section 309(g) of the CWA, 33 U.S.C. § 1319(g), or a comparable state law, to adequately redress the violations within the Notice Letter.

6. Venue in the Northern District of Iowa is proper pursuant to Section 505 of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the CWA violations is located wholly within this District.

## PARTIES

7. Defendant Agri Star is an Iowa limited liability company with its principal place of business in Postville, Iowa. Agri Star holds NPDES Permit No. IA0375102 for its Postville Facility.

8. At all relevant times, Agri Star was and is a "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5).

9. Plaintiff Driftless Water Defenders is a nonprofit organization incorporated in Iowa. Its purposes include combatting water pollution from industrial agriculture to protect and enhance Iowans' access to clean water for personal, business, and recreational purposes in the Driftless Area of northeast Iowa, where the Postville Facility is located, and statewide. DWD maintains a diverse and growing membership of over 240 individuals in more than 20 Iowa counties, including Allamakee County.

10. At all relevant times, DWD was and is a "person" as that term is defined by the CWA, 33 U.S.C. § 1362(5).

11. DWD has members, including but not limited to John Beard, Steve Veysey, Curtis Lundy, and Lyle Otte, who use and enjoy Hecker Creek and the Yellow River. DWD's members, including Mr. Beard, Mr. Veysey, Mr. Lundy, and Mr. Otte, have environmental, recreational, aesthetic, economic, and cultural interests in Hecker Creek and the Yellow River that are impaired by Agri Star's unlawful discharge of pollutants and violations of its NPDES Permit.

12. Mr. Beard has actively used the Yellow River for recreation, including trout fishing at numerous access points downstream of the Postville Facility as well as floating, boating, and canoeing. Mr. Beard also enjoys walking along the bank of the Yellow River and observing its scenic beauty. Mr. Veysey has regularly fished for trout at a Yellow River access point downstream

3

of the Postville Facility and has conducted volunteer water quality monitoring along Hecker Creek and where Hecker Creek intersects with the Yellow River. Mr. Lundy owns property downstream of the Postville Facility near the juncture of Hickory Creek and the Yellow River. He has used the segment of the Yellow River near his property for kayaking and fishing. Beyond the impacts Agri Star's pollution has on the Yellow River, Mr. Lundy is also concerned about the impact that pollution may have on his property and economic interests. Mr. Otte deeply cares about the cultural history and significance of the Yellow River and surrounding area. He recently observed the River's scenery while visiting a Native American heritage site at Allamakee County Park and has previously found an ancient Native American artifact near the Yellow River.

13. Mr. Beard, Mr. Veysey, Mr. Lundy, and Mr. Otte would like to continue using and enjoying the portions of the Yellow River to which Agri Star has and continues to discharge pollutants harmful to human health, the environment, and aquatic life. Excessive amounts of these pollutants degrade the water quality of Hecker Creek and the Yellow River, make the water aesthetically unpleasant and environmentally undesirable, and impair its suitability for aquatic life—particularly for species like trout that are sensitive to pollution. Out of fear and concern over the pollution, Mr. Veysey, Mr. Lundy, Mr. Beard, and Mr. Otte refrain from and/or restrict their usage of the Yellow River, and their enjoyment of the activities they partake in is lessened by the knowledge and existence of Agri Star's unlawful pollution. As a result, the environmental, recreational, aesthetic, economic, and cultural interests of these members are injured by Agri Star's unlawful discharges.

14. DWD has other members who are similarly injured by Agri Star's unlawful discharges to Hecker Creek and the Yellow River.

15. As a result of Agri Star's unlawful discharges, DWD's members' environmental, recreational, aesthetic, economic, and cultural interests are adversely affected. If those unlawful discharges ceased as a result of relief ordered by this Court, then the harm to the interests of DWD's members would be redressed. An injunction would redress DWD's members' injuries by preventing future violations of the limits in Agri Star's permit. Civil penalties would deter future violations.

## STATUTORY AND REGULATORY FRAMEWORK

16. Section 505(a) of the CWA, 33 U.S.C. § 1365(a), provides that "any citizen may commence a civil action . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter."

17. Section 505(f) of the CWA, 33 U.S.C. § 1365(f), defines an "effluent standard or limitation under this chapter" for purposes of the citizen suit provision to mean, among other things, an act unlawful under Section 301(a) of the CWA, 33 U.S.C. § 1311(a), or a "permit or condition" issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(a). 33 U.S.C. §§ 1365(f)(1), (f)(7).

18. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States, except in compliance with the terms and conditions of a permit, including NPDES permits issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

19. Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the permit-issuing authority, such as IDNR, may issue a NPDES permit that authorizes the discharge of any pollutant directly into waters of the United States, upon the condition that such discharge will meet all

5

applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

20. Any discharge that exceeds the effluent limitations or violates the conditions of an applicable NPDES permit constitutes an unlawful discharge in violation of Section 301 of the CWA, 33 U.S.C. § 1311.

21. On August 10, 1978, the Administrator of EPA authorized IDNR (at that time, the Iowa Department of Environmental Quality), pursuant to Section 402(a)(2) of the CWA, 33 U.S.C. § 1342(a)(2), to issue NPDES permits. *See* https://www.epa.gov/npdes/npdes-state-program-authority. Accordingly, NPDES permits issued by IDNR are subject to the prohibitions and limitations described above under Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, and to enforcement under Section 505 of the CWA. 33 U.S.C. § 1365.

22. In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order the defendant to comply with the CWA and to assess civil penalties.

23. Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

24. Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates Section 301 of the CWA, 33 U.S.C. § 1311, or violates any permit condition or limitation issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, "shall be subject to a civil penalty" payable to the United States of up to $25,000 per day for each violation.

25. Pursuant to the Federal Civil Penalties Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015,

Public Law 114-74, this Court may assess a civil penalty of up to $68,445 per day for each violation that occurred after November 2, 2015 and for which penalties are assessed after January 8, 2025. 40 C.F.R. § 19.4; Civil Monetary Penalty Inflation Adjustment, 88 Fed. Reg. 89,309 (Dec. 27, 2023).

## FACTUAL BACKGROUND

26. Agri Star's Postville Facility is a large slaughterhouse that processes meat and poultry. The wastewater generated from the Postville Facility is composed of pollution from slaughtering and processing meat and carcasses, and clean-up operations. The Postville Facility includes a wastewater treatment system consisting of a lift station, a raking bar, a Roto screen, a covered anaerobic lagoon, two aerations basins, two clarifiers, four industrial lagoons that receive mainly stormwater, and two additional storage lagoons that receive industrial return wastewater, sludge supernatant, non-contact cooling water, and boiler blowdown.

27. At all relevant times, Agri Star has held NPDES Permit No. IA0375102, which regulates discharges from Agri Star's Postville Facility. The NPDES Permit was issued on August 1, 2022, and is set to expire on July 31, 2027. The NPDES Permit was last amended on December 1, 2024.

28. The NPDES Permit authorizes Agri Star to discharge treated wastewater and non-contact cooling water to Hecker Creek through Outfall 001 in accordance with certain effluent limitations, monitoring requirements, and other conditions set forth in the NPDES Permit.

29. Hecker Creek is a tributary of the Yellow River. Discharges to Hecker Creek flow into the Yellow River and then continue downstream.

30. Both Hecker Creek and the Yellow River are waters of the United States subject to CWA jurisdiction.

31. Both Hecker Creek and the Yellow River are listed as impaired waterways on Iowa's CWA Section 303(d) impaired waterway list. Hecker Creek is impaired from chloride and has a "low fish IBI" (Index of Biological Integrity) and thus does not meet water quality requirements to sustain its designated use: "Aquatic Life: Warm Water Type 1" (BWW1) and "Recreation, Primary contact" (Class A1). The Yellow River segments downstream of the Postville Facility (01-YEL-436; 01-YEL-435) have "Fish Kill" and "low fish IBI" impairments, respectively, and so do not meet water quality requirements to sustain their designated uses. For 01-YEL-436, those designated uses are: "Aquatic Life: Cold Water Type 1" (BCW1), "Aquatic Life: Warm Water Type 1" (BWW1), "Recreation Secondary contact" (Class A2), and "Recreation, Primary contact" (Class A1). For 01-YEL-435, the designated use is "Aquatic Life, Warm Water Type 1" (Class BWW1).

32. The NPDES Permit requires compliance with numeric effluent limitations for pollutants, including the following: ammonia nitrogen effluent limitations of 96.7 lbs./day and 8.0 mg/L daily max and 48.4 lbs./day and 1.0–4.0 mg/L monthly average; copper effluent limitations of 0.0269 mg/L daily max and 0.01687 mg/L monthly average; total suspended solids effluent limitations of 293 lbs./day daily max and 146 lbs./day monthly average; chloride effluent limitations of 762 mg/L daily max and 471 mg/L monthly average; oil and grease effluent limitations of 139 lbs./day daily max and 70 lbs./day monthly average; biochemical oxygen demand limitations of 238 lbs./day daily max and 119 lbs./day monthly average; a pH effluent limitation minimum of 6.5 standard units; and a dissolved oxygen effluent limitation minimum of 5.0 mg/L.

33. Agri Star is required to self-monitor its discharges for compliance with these effluent limitations and report that information on discharge monitoring reports.

34. In its discharge monitoring reports, Agri Star has reported numerous violations of its NPDES Permit limits for ammonia nitrogen, copper, total suspended solids, chloride, oil and grease, biochemical oxygen demand, dissolved oxygen, and pH at Outfall 001 on the dates shown in Appendix A, which is incorporated by reference into this Complaint as if fully set forth within.

35. Agri Star's ongoing violations of its NPDES Permit's effluent limitations have continued through the date of the filing of this Complaint, with recent violations of Agri Star's limitations for chloride and ammonia. Based on the ongoing and consistent nature of these violations, it is reasonably likely that Agri Star will continue to violate its effluent limitations in the future.

36. The NPDES Permit also imposes on Agri Star "Monitoring and Reporting Requirements," which sets forth the wastewater parameters to be sampled, the type of sample, the sampling frequency, and the monitoring locations. Standard Condition No. 3 from the NPDES Permit provides additional requirements for "Monitoring and Records of Operation."

37. Standard Condition No. 7 from the NPDES Permit imposes on Agri Star a "Duty to Comply," specifying that any permit noncompliance constitutes a violation of the Iowa Code and the CWA.

38. Agri Star's discharge monitoring reports show numerous "non-receipt" violations of the Monitoring and Reporting Requirements and Standard Condition Nos. 3 and 7 due to Agri Star's failure to conduct sampling at the required frequencies on the dates shown in Appendix B, which is incorporated by reference into this Complaint as if fully set forth within.

39. Agri Star has also violated the NPDES Permit's Monitoring and Reporting Requirements and Standard Condition Nos. 3 and 7 due to late-submitted or missing measurements

9

on the dates shown in Appendix C, which is incorporated by reference into this Complaint as if fully set forth within.

40. Standard Condition No. 9 from the NPDES Permit requires that Agri Star ensure all facilities and control systems are operated efficiently and maintained in good working order, and maintain adequate laboratory controls and quality assurance procedures to ensure compliance with the NPDES Permit.

41. Public records show that Agri Star has violated and is violating Standard Condition No. 9 by failing to have sufficient resources, personnel, and equipment at hand to comply with the terms of the NPDES Permit. For instance, Agri Star fails to properly calibrate influent and effluent flow meters and does not measure any flow going from the wastewater lagoon to its industrial lagoons. Agri Star fails to properly maintain its treatment system during cold weather periods. Agri Star fails to properly maintain the banks of its lagoons, resulting in heavy vegetation that is contrary to sections 18C.7.2.1 and 18C.7.2.5 of Iowa's "Facilities Design Standards" for "Wastewater Treatment Ponds (Lagoons)." Agri Star staff have been improperly trained and lack the required operator certifications. Agri Star has also used expired chemicals.

42. As of the date of this Complaint, neither IDNR nor EPA has sought to enforce the CWA violations identified in the Notice Letter and this Complaint against Agri Star though an administrative penalty action, civil action, or criminal action. There has been no administrative penalty imposed for any of these violations, nor has there been any public notice of an administrative enforcement proceeding that affords an opportunity for public participation. Based on information and belief, as well as Agri Star's repeated history of violating its NPDES Permit, the violations identified in this Complaint are ongoing and reasonably likely to recur in the future.

**CLAIM FOR RELIEF**

43. Plaintiff incorporates by reference all allegations contained herein in paragraphs 1 through 42.

44. Since at least July 2021, Agri Star has discharged and continues to discharge pollutants from a point source, *i.e.*, Outfall 001 of the Postville Facility, into Hecker Creek and the Yellow River in excess of the effluent limits in the NPDES Permit.

45. Hecker Creek and the Yellow River are both navigable waters of the United States within the meaning of 33 U.S.C. § 1362(7) and 33 C.F.R. § 328.3(a)(3).

46. Pursuant to Section 505(f) of the CWA, 33 U.S.C. § 1365(f), the discharge of pollutants in excess of permit limits is a violation of an "effluent standard or limitation" under Section 301 of the CWA. As such, Agri Star's past and continuing violations of the effluent limitations in the NPDES Permit are subject to enforcement through the citizen suit provision of Section 505(a)(1) of the CWA. 33 U.S.C. § 1365(a)(1).

47. Since at least December 2020, Agri Star has also violated and continues to violate the requirements and conditions of the NPDES Permit by failing to conduct sampling at the required frequencies and submitting late or missing measurements to IDNR. Each of these instances is a standalone violation of the CWA, subject to the maximum daily civil penalty.

48. Additionally, Agri Star has violated and continues to violate the requirements and conditions of the NPDES Permit by failing to have sufficient resources, personnel, and equipment at hand to comply with the terms of the NPDES Permit. Each day of this noncompliance represents a standalone violation of the CWA, subject to the maximum daily civil penalty.

49. Pursuant to Section 505(f) of the CWA, 33 U.S.C. § 1365(f), the violation of a permit or a condition of a permit is a violation of an "effluent standard or limitation" under Section

301 of the CWA. As such, Agri Star's past and continuing violations of requirements and conditions of the NPDES Permit are subject to enforcement through the citizen suit provision of Section 505(a)(1) of the CWA. 33 U.S.C. § 1365(a)(1).

50. Agri Star is in continuing and/or intermittent violation of the CWA as a result of its exceedance of effluent limits and violation of the conditions in the NPDES Permit and is subject to enforcement through the citizen suit provision in Section 505(a)(1) of the CWA. 33 U.S.C. § 1365(a)(1). These violations are ongoing and are reasonably likely to recur in the future.

51. Pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, Agri Star is liable for civil penalties up to $68,445 per day for each day of each CWA violation that occurred after November 2, 2015. *See* 40 C.F.R. § 19.4; 88 Fed. Reg. 89,309.

52. Agri Star should be enjoined from continuing to violate the CWA, as described below in Relief Requested.

**RELIEF REQUESTED**

Wherefore, DWD respectfully requests that the Court enter an order:

1. Declaring that Agri Star has violated and is in continuing violation of the CWA;

2. Issuing injunctive relief to ensure future compliance with the CWA in the following ways:

   a. Requiring Agri Star to achieve immediate compliance with the NPDES Permit, through either a reduction of Agri Star's daily operational capacity, or through the installation of new pollution control technology that will expeditiously achieve compliance with the effluent limitations of the NPDES Permit;

   b. Requiring Agri Star to hire, train, and maintain staff with sufficient expertise to operate and maintain Agri Star's pollution control technologies;

12

c. Requiring Agri Star to ensure its wastewater treatment and pollution control operations are adequately supplied with appropriate cleaning and sanitation chemicals that are not expired; and

d. Granting other injunctive relief that this Court deems appropriate.

3. Compelling Agri Star to immediately comply with all terms and conditions, including effluent limitations, monitoring and reporting requirements, and operations and management requirements, of the NPDES Permit;

4. Compelling Agri Star to pay an appropriate civil penalty of up to $68,445 per day for each CWA violation;

5. Ordering Agri Star to conduct monitoring and sampling to determine the environmental effects of its violations, to remedy and repair environmental contamination and/or degradation caused by its violations, and to restore the environment to its prior condition;

6. Awarding DWD its attorneys' fees, expert witness fees, and all other reasonable costs and expenses incurred in the pursuit of this action; and

7. Granting any other such relief as this Court deems just and proper.

Dated: February 24, 2025

Respectfully submitted,

/s/ *James C. Larew*
James C. Larew AT0004543
LAREW LAW OFFICE
504 East Bloomington Street
Iowa City, Iowa 52245
Telephone: (319) 447-7079
Facsimile: (319) 337-7082
Email: james.larew@larewlawoffice.com
**ATTORNEY FOR PLAINTIFF
DRIFTLESS WATER DEFENDERS**

# APPENDIX A: VIOLATIONS OF EFFLUENT LIMITS

| Violation # | Date | Parameter | Type | Limit | Reported | Units | % Over Limit |
|---|---|---|---|---|---|---|---|
| 1 | Jul-21 | Copper | Monthly Avg | 0.01687 | 0.0169 | mg/L | 0.18% |
| 2 | Jul-21 | Oil & Grease | Monthly Avg | 73 | 123.8323 | lbs./day | 69.63% |
| 3 | Sep-21 | Copper | Daily Max | 0.0269 | 0.0288 | mg/L | 7.06% |
| 4 | Oct-21 | Total Suspended Solids | Daily Max | 317 | 377.6018 | lbs./day | 19.12% |
| 5 | Dec-21 | Total Suspended Solids | Daily Max | 317 | 481.3431 | lbs./day | 51.84% |
| 6 | Jan-22 | Copper | Daily Max | 0.0269 | 0.0343 | mg/L | 27.51% |
| 7 | Jan-22 | Total Suspended Solids | Daily Max | 317 | 462.9534 | lbs./day | 46.04% |
| 8 | Feb-22 | Copper | Daily Max | 0.0269 | 0.0283 | mg/L | 5.20% |
| 9 | Feb-22 | Copper | Monthly Avg | 0.01687 | 0.016933 | mg/L | 0.37% |
| 10 | Apr-22 | Copper | Daily Max | 0.0269 | 0.0276 | mg/L | 2.60% |
| 11 | May-22 | Ammonia Nitrogen (N) | Monthly Avg | 1.8 | 1.824516 | mg/L | 1.36% |
| 12 | May-22 | Total Suspended Solids | Daily Max | 317 | 494.3952 | lbs./day | 55.96% |
| 13 | Aug-22 | Copper | Monthly Avg | 0.01687 | 0.017213 | mg/L | 2.03% |
| 14 | Sep-22 | Total Suspended Solids | Daily Max | 293 | 338.2704 | lbs./day | 15.45% |
| 15 | Nov-22 | Total Suspended Solids | Daily Max | 293 | 600.48 | lbs./day | 104.94% |
| 16 | Dec-22 | Total Suspended Solids | Daily Max | 293 | 354.867 | lbs./day | 21.12% |
| 17 | Dec-22 | pH | Min | 6.5 | 6.3 | S.U. | -3.08% |
| 18 | Jul-23 | Copper | Daily Max | 0.0269 | 0.0286 | mg/L | 6.32% |

| Violation # | Date | Parameter | Type | Limit | Reported | Units | % Over Limit |
|---|---|---|---|---|---|---|---|
| 19 | Jul-23 | Copper | Monthly Avg | 0.01687 | 0.018153 | mg/L | 7.61% |
| 20 | Jul-23 | Dissolved Oxygen | Min | 5.0 | 4.8 | mg/L | -4.00% |
| 21 | Aug-23 | Ammonia Nitrogen (N) | Daily Max | 8.0 | 15.5 | mg/L | 93.75% |
| 22 | Aug-23 | Ammonia Nitrogen (N) | Monthly Avg | 1.0 | 3.14 | mg/L | 214.00% |
| 23 | Aug-23 | Ammonia Nitrogen (N) | Daily Max | 96.7 | 130.6919 | lbs./day | 35.15% |
| 24 | Aug-23 | Copper | Daily Max | 0.0269 | 0.0485 | mg/L | 80.30% |
| 25 | Aug-23 | Copper | Monthly Avg | 0.01687 | 0.022814 | mg/L | 35.23% |
| 26 | Aug-23 | Total Suspended Solids | Daily Max | 293 | 371.547 | lbs./day | 26.81% |
| 27 | Nov-23 | Total Suspended Solids | Daily Max | 293 | 567.7371 | lbs./day | 93.77% |
| 28 | Mar-24 | Oil & Grease | Daily Max | 139 | 143.8816 | lbs./day | 3.51% |
| 29 | Mar-24 | Oil & Grease | Monthly Avg | 70 | 143.8816 | lbs./day | 105.55% |
| 30 | Aug-24 | Chloride | Daily Max | 762 | 878 | mg/L | 15.22% |
| 31 | Aug-24 | Chloride | Monthly Avg | 471 | 767.75 | mg/L | 63.00% |
| 32 | Sep-24 | Ammonia Nitrogen (N) | Daily Max | 96.7 | 1149.919 | lbs./day | 1089.16% |
| 33 | Sep-24 | Total Suspended Solids | Daily Max | 293 | 19165.32 | lbs./day | 6441.06% |
| 34 | Sep-24 | Total Suspended Solids | Monthly Avg | 146 | 655.9365 | lbs./day | 349.27% |
| 35 | Sep-24 | Chloride | Daily Max | 762 | 957 | mg/L | 25.59% |
| 36 | Sep-24 | Chloride | Monthly Avg | 471 | 867.8888 | mg/L | 84.27% |
| 37 | Sep-24 | Biochemical Oxygen | Daily Max | 238 | 19165.32 | lbs./day | 7952.66% |

| Violation # | Date | Parameter | Type | Limit | Reported | Units | % Over Limit |
|---|---|---|---|---|---|---|---|
| | | Demand (BOD5) | | | | | |
| 38 | Sep-24 | Biochemical Oxygen Demand (BOD5) | Monthly Avg | 119 | 655.9159 | lbs./day | 451.19% |
| 39 | Oct-24 | Chloride | Daily Max | 762 | 954 | mg/L | 25.20% |
| 40 | Oct-24 | Chloride | Monthly Avg | 471 | 840 | mg/L | 78.34% |
| 41 | Nov-24 | Chloride | Daily Max | 762 | 926 | mg/L | 21.52% |
| 42 | Nov-24 | Chloride | Monthly Avg | 471 | 888.625 | mg/L | 88.67% |
| 43 | Dec-24 | Ammonia Nitrogen (N) | Daily Max | 8.0 | 35.8 | mg/L | 347.50% |
| 44 | Dec-24 | Ammonia Nitrogen (N) | Monthly Avg | 2.5 | 6.118387 | mg/L | 144.74% |
| 45 | Dec-24 | Copper | Daily Max | 0.0269 | 0.0285 | mg/L | 5.95% |
| 46 | Dec-24 | Chloride | Daily Max | 762 | 982 | mg/L | 28.87% |
| 47 | Dec-24 | Chloride | Monthly Avg | 471 | 925.5 | mg/L | 96.50% |

## APPENDIX B: SAMPLING VIOLATIONS

| Sampling Violation | Relevant Sampling Period(s) |
|---|---|
| Failure to sample effluent Total Nitrogen on a bi-monthly basis. | December 2020 to July 2021 |
| Failure to sample influent Total Kjeldahl Nitrogen on a bi-weekly basis. | September 2021 |
| Failure to sample effluent Total Residual Chlorine, Temperature, and pH on a daily basis. | November 18, 2021 |
| Failure to sample Dissolved Oxygen on a daily basis. | November 18, 2021<br>May 2022<br>June 2022 |
| Failure to record influent flow on a daily basis. | April 2022 |
| Failure to sample Ammonia Nitrogen on a daily basis. | November 26, 2022 |
| Failure to collect five E. coli samples in one calendar month for every quarter specified by permit. | November 2020 to March 2021<br>March 2021 to June 2021<br>November 2021 to March 2022<br>March 2022 to May 2022<br>September 2022 to November 2022 |
| Failure to sample effluent Fecal Coliform on a monthly basis. | January 2023 |
| Failure to sample influent and effluent Total Suspended Solids on a daily basis. | June 25–26, 2023 |
| Failure to sample influent Biochemical Oxygen Demand and effluent Carbonaceous Biochemical Oxygen Demand on a daily basis. | May 1, 2021<br>August 30–31, 2022<br>November 26, 2022<br>June 25–26, 2023 |

**APPENDIX C: LATE OR MISSING MEASUREMENT VIOLATIONS**

| Monitoring Period | Deadline to Submit DMR Measurement | Date of Submission** |
|---|---|---|
| December 2020 | January 15, 2021 | January 29, 2021 |
| April 2022 | May 15, 2022 | May 17, 2022 |
| May 2022 | June 15, 2022 | June 17, 2022 |
| November 2022 | December 15, 2022 | December 21, 2022 |
| December 2022 | January 15, 2023 | Unknown |
| January 2023 | February 15, 2023 | Unknown |
| February 2023 | March 15, 2023 | Unknown |
| April 2023 | May 15, 2023 | May 16, 2023 |
| June 2023 | July 15, 2023 | July 18, 2023 |
| December 2023 | January 15, 2024 | Unknown |
| January 2024 | February 15, 2024 | Unknown |
| February 2024 | March 15, 2024 | Unknown |

** For entries marked "unknown," EPA's Enforcement and Compliance History Online lists the non-receipt violation but does not specify the date of submission, and that information is otherwise inaccessible.