# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

DRIFTLESS WATER DEFENDERS,

Plaintiff,

vs.

AGRI STAR MEAT & POULTRY, LLC,

Defendant.

No. 25-CV-1007-CJW-MAR

**MEMORANDUM OPINION AND ORDER**

_____

Cross motions for summary judgment are before the Court. Defendant filed a motion for summary judgment. (Doc. 26). Plaintiff filed a resistance to defendant's motion and a motion for partial summary judgment of its own. (Doc. 33). Defendant filed a resistance to plaintiff's motion and reply on its own motion. (Doc. 36). Plaintiff filed a reply on its own motion. (Doc. 38).

On April 24, 2026, the Court heard oral argument on both motions. (Doc. 41).

For the following reasons, defendant's motion for summary judgment (Doc. 26) is **granted** and plaintiff's motion for partial summary judgment (Doc. 33) is therefore **denied as moot**.

## I. FACTUAL BACKGROUND

Under the Clean Water Act ("CWA"), companies may not discharge pollutants into a water of the United States unless they have a National Pollutant Discharge Elimination System ("NPDES") permit. (Doc. 33-2, at 3). A company's NPDES permit tailors CWA requirements to the company's specific situation, listing the company's discharge, monitoring, and reporting requirements, among other provisions. (*Id.*). The permits require compliance with all federal and state standards and sometimes require

additional controls based on local conditions. (*Id.*, at 4). The Environmental Protection Agency ("EPA") has delegated its authority in Iowa to administer the NPDES program to the Iowa Department of Natural Resources ("IDNR"). (*Id.*, at 3).

Defendant, who operates a large-scale kosher beef and poultry processing plant, discharges wastewater, and therefore has a NPDES permit. (*Id.*, at 4). Defendant's permit establishes its maximum effluent discharge concentrations, which limit the concentration of certain pollutants defendant may discharge into Hecker Creek. (*Id.*).

In 2016, the IDNR issued defendant a permit. The 2016 permit notified defendant that its chloride limits were going to be significantly reduced starting in August 2021. (*Id.*, at 6–7). The 2016 permit also directed defendant to submit to the IDNR a compliance strategy defendant would employ to comply with the chloride limits and to submit yearly progress reports. (Doc. 26-2, at 24). Defendant submitted the required compliance strategy and yearly progress reports. (Doc. 33-2, at 9). Defendant instituted steps attempting to reduce its chloride discharge levels to the reduced limit. (*Id.*).

In June 2021, defendant submitted a request to the IDNR seeking an extension of the effective date of the final chloride limits. (*Id.*, at 9–10). The IDNR requested, and defendant provided, a summary of completed work and planned work for addressing the chloride issue and an explanation of the reason defendant required an extension of the deadline. (*Id.*, at 10). The IDNR granted defendant's request and extended the effective date for the final chloride limits to August 2024. (*Id.*). A new permit, issued in 2022, appears to essentially reflect the same August 2024 effective date for the lower chloride limits and continued to require defendant to submit annual compliance progress reports. (*Id.*, at 10–11).

On July 1, 2024, defendant requested the IDNR again extend the final chloride limits effective date, this time to June 2027. (*Id.*, at 11). Two days later, the IDNR denied defendant's request. (*Id.*).

2

Throughout this period—2016 to 2024—defendant reduced its chloride discharge to some degree, although the parties differ in how they characterize the level of reduction, whether the chloride concentration was "significantly reduced" or just reduced. (*Id.*, at 11–12). Defendant took steps in efforts to reduce its chloride discharge, including, for example, water monitoring, modifying the poultry processing line in several ways, changing equipment related to the "soak and salt system," and consulting a "hydrogeologist," among several other things, most of which related to updating or adding equipment. (*Id.*, at 12–13).

When the lower chloride limits finally kicked in, though, defendant had not reduced its discharge enough to comply. The IDNR sent defendant notices of violation, for example, in November 2024, December 2024, January 2025, February 2025, and April 2025. (*Id.*, at 16).[1] Some of defendant's violations also included other pollutants like ammonia nitrogen and copper, although those appear to be less consistent issues compared to chloride. (*Id.*, at 17–18). Ultimately, though, defendant has consistently violated the chloride limits since they became effective, and copper appears to be a problem for defendant as well. In all, defendant violated its discharge limits 96 separate times between July 2021 and approximately the end of 2025. (Doc. 36-1, at 5–11). In a document dated January 21, 2025, defendant listed its "Anticipated chloride compliance date" as June 1, 2027. (Doc. 33-4, at 2).

On February 24, 2025, plaintiff filed this lawsuit against defendant under the citizen suit provisions of the CWA. (Doc. 33-2, at 19). Before filing suit, plaintiff notified defendant, the IDNR, the EPA, and the U.S. Attorney General of its intent to

---

[1] Defendant continually states that it worked with the IDNR in addressing its compliance issues. (*See, e.g.*, Doc. 33-2, at 17). Defendant mainly relies upon notices of violation the IDNR sent defendant, which include requests that defendant respond with a status update, and defendant's responsive status updates. As plaintiff notes, it might be a stretch to characterize defendant's interactions with the IDNR as the two "working together."

file a civil action against defendant after sixty days, as required under the relevant statute. (Doc. 36-1, at 16). Plaintiff's complaint requests declaratory and injunctive relief ensuring defendant's compliance with its permit, requiring defendant to pay a civil penalty, ordering defendant to monitor and sample the environmental effects of its violations, and awarding plaintiff fees, costs, and expenses. (Doc. 33-2, at 19).

On July 18, 2025, the IDNR, led by the Iowa Attorney General's office, filed a petition in state court against defendant for the same permit violations alleged by plaintiff here. (*Id.*).[2] The IDNR and defendant had apparently met in the days before the IDNR filed the petition and agreed to a resolution to the "dispute" in the form of a consent decree, which the IDNR and defendant filed contemporaneously with the petition. (Docs. 38-4, at 11–15; 36-1, at 23). The state court entered the consent decree two business days later. (Docs. 33-2, at 21; 36-1, at 23). Plaintiff learned about the state court suit shortly after the state court entered the consent decree and attempted to intervene. (Doc. 36-1, at 29). The state court denied plaintiff's motion to intervene, which plaintiff appealed, and the appeal is still pending. (*Id.*, at 29–30).

The decree requires defendant to complete upgrades to its facility which will enable full compliance with the permit by January 1, 2026, particularly regarding compliance with chloride and copper limits. (Doc. 33-2, at 22). The decree therefore effectively pushed back defendant's compliance deadline over a year from the previous

---

[2] Defendant characterizes the lawsuit as "the next step in an escalating enforcement strategy." (*Id.*, at 21). This, again, would appear to be a stretch. Before the lawsuit, the IDNR had sent notices of violation, granted one of defendant's requests to postpone the final chloride limit effective date, and later denied one of defendant's requests to again postpone the final chloride limit effective date. The word "escalating" is certainly doing most of the work in the phrase "escalating enforcement strategy" here. Indeed, it appears the violations at issue had not been subject to prior administrative compliance or administrative penalty orders by the IDNR. (Doc. 36-1, at 13). Defendant would contend, however, that the notices of violation themselves were a form of enforcement. (*Id.*, at 20).

4

August 2024 date.  The decree also includes reporting requirements on defendant's part for permit violations, requires defendant to submit progress reports to the IDNR, and requires defendant to develop and implement an ongoing "Preventive Maintenance Plan" for its wastewater treatment facility.  (*Id.*).  The decree imposes a civil penalty on defendant of $50,000 for defendant's past violations.  (*Id.*, at 23).  The decree also includes the following provision regarding future violations:

> Except as otherwise provided herein, upon receipt of written demand from DNR, [defendant] shall pay $1,000 per day in stipulated civil penalties for violation of this Consent Decree as for each day [defendant] fails to comply with each of the deadlines contained in paragraphs five (5) through eleven (11) of this Consent Decree.  At least seven (7) days before issuing a written demand under this paragraph, DNR shall meet and confer with [defendant] regarding the alleged instance of noncompliance giving rise to a written notice.

(Doc. 26-7, at 25).  If a violation continues for more than 180 days, the IDNR may choose to request that the state court assess defendant up to a maximum civil penalty of $5,000 per day per violation occurring after the date of the IDNR's application.  (*Id.*).  The IDNR must meet and confer with defendant regarding its intention to file such an application.  (*Id.*).

Defendant has paid the $50,000 civil penalty already.  (Doc. 33-2, at 24).  Defendant is also in compliance with the consent decree, or at least was at the time defendant filed its motion for summary judgment in November 2025.  (*Id.*).  Defendant continues, however, in its failure to comply with the chloride limits listed in its permit.  (*Id.*; Doc. 36-1, at 30).  The IDNR has issued another notice of violation to defendant for exceedances which occurred after the entry of the consent decree.  (Doc. 36-1, at 31).  It appears defendant then again exceeded the permit's monthly average limitation of chloride concentration in November 2025.  (Doc. 38-1, at 5).  Defendant also submitted its first required progress report under the consent decree.  (Doc. 33-2, at 24).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (citing *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp.*, 477 U.S. at 323). The plaintiff may not then simply point to allegations made in its complaint, but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88. *See also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

### III. ANALYSIS

Both parties' motions for summary judgment are before the Court. (Docs. 26 & 33). The Court will take up defendant's motion first.

#### A. *Defendant's Motion for Summary Judgment*

Defendant moves for summary judgment on several grounds. Defendant argues this Court does not have jurisdiction over plaintiff's claim under the CWA because Iowa diligently prosecuted an action under comparable state law, res judicata precludes relitigation of plaintiff's claim because it was already addressed in the state lawsuit, and

7

the consent decree entered in the state lawsuit moots plaintiff's claim. (Doc. 29). Plaintiff resists each of defendant's arguments. (Doc. 33-1).

Plaintiff brings its claim under the "citizen suits" section of the CWA, Title 33, United States Code, Section 1365. Section 1365 provides: "Except as provided in section (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf against any person . . . who is alleged to be in violation of an effluent standard or limitation under this chapter[.]" 33 U.S.C. § 1365(a)(1) (cleaned up). Section 1319(g)(6), in turn, provides in relevant part "that any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty under . . . section 1365 of this title." *Id.* § 1319(g)(6)(A)(ii). Congress set up this system, where citizens may file suit only if the government is not diligently prosecuting enforcement, to reflect the policy that "citizen suit[s are] meant to supplement rather than to supplant governmental action." *Gwaltney of Smithfield, Ltd. V. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987). When citizens bring suits under the CWA, they are "cast in the role of private attorneys general[.]" *E.P.A. v. City of Green Forest*, 921 F.2d 1394, 1404 (8th Cir. 1990).

Defendant argues the IDNR's "enforcement action" against defendant bars plaintiff's suit here under Section 1319(g)(6). (Doc. 29, at 16–20). Plaintiff makes several arguments in resistance. (Doc. 33-1, at 16–27). One of plaintiff's arguments is that the IDNR did not commence an action before plaintiff filed suit in this case. At the summary judgment stage, the Court sides with plaintiff on this argument. As noted in the facts section above, the IDNR's actions regarding defendant before plaintiff filed this lawsuit were to issue the permit, grant or deny defendant's requests for extensions of its deadlines, and to issue defendant notices of violation. Especially at summary judgment, where the Court must construe the factual record in favor of plaintiff, the Court does not

8

find as a matter of law that the IDNR had commenced an action against defendant prior to plaintiff's filing of this lawsuit.  Defendant did not attempt to develop many facts regarding notices of violation and what they might lead to, if anything.  For all the Court knows, and indeed from what appears happened here, notices of violation might not be worth much more than the paper on which they are written.  Without defendant developing the record regarding notices of violation, the Court cannot say the IDNR absolutely commenced an action against defendant here before plaintiff filed its complaint.  The Court therefore rejects defendant's motion on its statutory defense under Section 1319(g)(6)(A).

But the Court agrees with defendant's argument that plaintiff's claim is precluded by res judicata principles.  Res judicata, or claim preclusion, can apply when a claim is related to an earlier claim already decided by a court.  The doctrine "bars the second action if three requirements are met: 1. 'the parties are the same,' 2. 'the claim in the second suit could have been fully and fairly adjudicated in the prior case,' and 3. 'there was a final judgment on the merits in the first action.'"  *Shontz v. Mercy Med. Ctr.-Clinton, Inc.*, 33 N.W.3d 598, 602 (Iowa 2026) (quoting *Lambert v. Iowa Dep't of Transp.*, 804 N.W.2d 253, 257 (Iowa 2011)).  Other Iowa Supreme Court cases clarify that the parties in the two cases need not literally be the same for claim preclusion to apply, but instead can either be the same or "the parties to the pending action are in privity with the parties to the prior action."  *Fisher v. City of Sioux City*, 654 N.W.2d 544, 548 (Iowa 2002).

Defendant argues plaintiff's claim is precluded here.  Defendant argues the consent decree is a final judgment, this suit and the state court lawsuit involve identical claims, and the IDNR is in privity with plaintiff.  (Doc. 29, at 20–22).  Plaintiff argues res judicata does not preclude plaintiff's claim for three reasons: (1) res judicata does not apply in CWA cases; (2) the IDNR and plaintiff are not in privity because the IDNR's

9

action was not diligent; and (3) plaintiff had no full and fair opportunity to litigate the issue in question. (Doc. 33-1, at 27–34). Unfortunately for plaintiff, and perhaps unfortunately for Iowa's water quality, there is an Eighth Circuit case on all fours here favoring defendant's position.

In *E.P.A. v. City of Green Forest*, 921 F.2d 1394, 1397 (8th Cir. 1990), the citizen plaintiffs brought a citizen suit against the defendants—Tyson Foods and the City of Green Forest—under the CWA and common law. Over six months later, the EPA commenced an action against the City and the state of Arkansas under the CWA. *Id.* The EPA's action resulted in the entry of a consent decree. *Id.* Relevant here, the trial court granted summary judgment to the City on the citizens' CWA claims, finding the consent decree in the other action between the EPA and the City precluded the citizens from pursuing the CWA claims against the City. *Id.* at 1400.

On appeal, the Eighth Circuit affirmed. The court explained that the CWA "casts the citizen in the role of a private attorney general." *Id.* at 1403. The court also noted that "the CWA was intended to be enforced by the government," and stated:

> The bar on citizen suits when governmental enforcement action is underway suggests that the citizen suit is meant to supplement rather than supplant governmental action. The legislative history of the Act reinforces this view of the role of the citizen suit. The Senate Report noted that '[t]he Committee intends the great volume of enforcement actions to be brought by the State,' and that citizen suits are proper only 'if the Federal, State, and local agencies fail to exercise their enforcement responsibility.'

*Id.* (quoting *Gwaltney*, 484 U.S. at 60). The court then addressed the issue directly: "In this case, we are faced squarely with the question whether citizens' claims brought prior to a government action are properly dismissed when a consent decree is entered in a later-filed EPA action." *Id.* The court concluded: "Recognizing the preeminent role that government actions must play in the CWA enforcement scheme, we hold that they are." *Id.*

The court's theory was that the state, or the EPA in *Green Forest*, represented all its citizens in a *parens patriae* suit. *Id.* at 1404. The court cited favorably *United States v. Olin Corp.*, 606 F. Supp. 1301 (N.D. Ala. 1985), another case where the subject company agreed to a consent decree with the state, where "[t]he court held that the plaintiffs' suit for injunctive relief was barred by res judicata because the same relief had been sought in the action brought by Alabama and the United States in a *parens patriae* capacity." *Green Forest*, 921 F.2d at 1404. So too in *Green Forest*. The court then continued its analysis:

> In view of the preeminent role that must be afforded the EPA in enforcing CWA violations—a role contemplated by the legislative history and recognized by the Supreme Court in *Gwaltney*—we hold that it was proper for the district court to dismiss [the citizens'] CWA claims against Green Forest after the latter had entered into a consent decree with the EPA. The EPA is charged with enforcing the CWA on behalf of all citizens. Since citizens suing under the CWA are cast in the role of private attorneys general, as a practical matter there was little left to be done after the EPA stepped in and negotiated a consent decree. . . . Fines recoverable pursuant to the CWA are payable to the United States Treasury and would not have been recovered directly by the aggrieved citizens had their action continued. While the citizens might have preferred more stringent terms than those worked out by the EPA, such citizens are no more aggrieved than citizens who are precluded from commencing an action in the first instance because of pending agency action.

*Id.*

The reasoning and conclusion in *Green Forest* controls here. Here, like in *Green Forest*, plaintiff filed its citizen suit against defendant; the state then filed suit against defendant; and defendant and the state then agreed to a consent decree, which the state court entered. The facts are on all fours. As the *Green Forest* court made clear, the EPA, essentially represented here by the IDNR, is the main enforcer of the CWA. "The EPA is charged with enforcing the CWA on behalf of all citizens." *Id.* If the EPA—or

Case 2:25-cv-01007-CJW-MAR    Document 42    Filed 05/29/26    Page 11 of 15

the IDNR here—represents all citizens in its actions enforcing the CWA, then the IDNR brought the state lawsuit on behalf of all Iowa citizens. The IDNR brought the action against defendant in state court in a parens patriae capacity. The *Green Forest* court stated: "Since citizens suing under the CWA are cast in the role of private attorneys general, as a practical matter there was little left to be done after the EPA stepped in and negotiated a consent decree." *Id.* Here, then, as a practical matter, there was little left to be done after the IDNR stepped in and negotiated a consent decree with defendant. And, just like in *Green Forest*, even though plaintiff may not be satisfied with the state of Iowa's enforcement or the terms of the consent decree, such feeling does not entitle plaintiff to continue pursuing its claim here after the state has stepped in on behalf of all its citizens.

Plaintiff argues res judicata does not preclude its claim on several grounds. First, plaintiff points to *Astoria Federal Savings & Loan Association v. Solimino*, 501 U.S. 104 (1991), for the proposition that courts do not apply common law rules of preclusion like res judicata "when a statutory purpose to the contrary is evident." (Doc. 33-1, at 28) (quoting *Astoria*, 501 U.S. at 108). Plaintiff essentially argues authority like *Green Forest* is no longer good law in the wake of *Astoria*. The Court sees two problems with plaintiff's argument. One, the *Astoria* court's broad statement does not necessarily contradict the *Green Forest* court's reasoning and conclusion. When there is an Eighth Circuit case directly on point, this Court must follow the authority so long as no Supreme Court authority points in a different direction. And two, the *Green Forest* case explains that the statutory purpose, at least the purpose of the broader statutory scheme, supports the preclusion of citizen suits once the state steps in. The broader idea is that the EPA, or its equivalent on the state level, is charged with enforcing the CWA, and citizens can step in if the EPA or the IDNR does not act. With this understanding, precluding citizen suits once the EPA or the IDNR acts is not contrary to the statutory purpose.

Second, plaintiff argues diligent prosecution is required by the IDNR for it and plaintiff to be in privity. The Court disagrees that diligence is a requirement here—it is a requirement under the statutory bar of citizen suits, but not in the res judicata analysis in the Eighth Circuit cases. The court's discussion in *Comfort Lake Association v. Dresel Contracting, Inc.*, 138 F.3d 351, 356–57 (8th Cir. 1998), explains the distinction fairly clearly. Diligent prosecution is not an element of res judicata here. Even if it were, plaintiff's arguments that the IDNR's prosecution was not diligent are largely complaints about the sufficiency of the relief the IDNR agreed to in the consent decree. The *Green Forest* court noted that a citizen's preference for different terms than those worked out between the state and the company does not give the citizen the right to bring a citizen suit. 921 F.2d at 1404. Plaintiff's argument that the IDNR's prosecution was not diligent because of "close coordination" between the IDNR and defendant to fast-track the entry of the consent decree also does not persuade the Court. The timeline of proceedings and perhaps the inferences one could make about the reasoning and outcome could certainly raise suspicions in reasonable minds about the IDNR's sincerity in protecting Iowa's waterways. But the timeline of the state court action does not show a lack of diligence—if anything, it shows the opposite.

Third, plaintiff argues res judicata does not apply here because plaintiff had no full and fair opportunity to litigate the issues in the state lawsuit. But the whole point is that the IDNR stood in the shoes of all citizens, including plaintiff. Res judicata does not require plaintiff to have had a full and fair opportunity to litigate previously, but that the IDNR had a full and fair opportunity to litigate the claim previously. The IDNR is seen to represent plaintiff—they are considered to be in privity—so the IDNR litigated on behalf of plaintiff in the state court lawsuit. Plaintiff again points to the timeline of the state court litigation and the sufficiency of the penalties against defendant in the state court litigation. The timeline and penalties may appear suspect, but the state has wide

latitude to enforce the CWA. As noted in *Green Forest*, plaintiff does not have the right to continue prosecuting its claim here because it disagrees with the terms the IDNR negotiated in its enforcement. In the end, the Court rejects plaintiff's arguments against res judicata, largely because the *Green Forest* case is simply too on point and plaintiff's other arguments cannot get around an Eighth Circuit case directly on point.

Defendant also argues plaintiff's suit is moot in light of the entry of the consent decree in the state court lawsuit. This Court need not address that argument given its conclusion regarding res judicata.

Plaintiff's paragraph summarizing its resistance argument deserves mention. Plaintiff states: "The doctrines of CWA Section 309(g)(6)(A), res judicata, and mootness do not apply to this case. [Defendant] and IDNR's efforts to frustrate citizen enforcement of the CWA as Congress intended should be rejected by the Court." (Doc. 33-1, at 37). Obviously, the Court disagreed with plaintiff's argument, at least regarding res judicata. There is certainly a strong argument that the terms of the state court consent decree are a slap on the wrist, and a light one at that, to defendant. And the Court cannot blame plaintiff for thinking defendant and the IDNR worked together to frustrate citizen enforcement—or much enforcement at all—of the CWA here. But the Court disagrees with plaintiff's comment that this decision is contrary to congressional intent. Congress set up the system so that the EPA, or the IDNR here, is responsible for enforcing the CWA. If they do not act, citizens can step in. But the EPA and the IDNR retain the primary enforcement authority. And, at least under Eighth Circuit precedent, the EPA and the IDNR can step in and be the primary enforcers, even after a citizen suit is filed, and such enforcement by the EPA or the IDNR, when reduced to a final judgment, has preclusive effect on the citizen suit.

And, arguably, the system worked here, at least to some degree. Absent plaintiff bringing suit, the IDNR may have done nothing to enforce its permits. Plaintiff's suit

appears to at least have spurred some action by the IDNR, however weak and perhaps ineffectual that enforcement may be.  Plaintiff may disagree with whether the IDNR's enforcement is sufficiently rigorous, but that is a decision Congress granted the IDNR to make.

Thus, the Court **grants** defendant's motion for summary judgment.

### B.     *Plaintiff's Motion for Partial Summary Judgment*

Plaintiff also filed a motion for partial summary judgment.  (Doc. 33).  Plaintiff argues it has the right to bring its claim and that defendant is strictly liable for violations of its permit and the CWA.  (*Id.*).  But the Court granted defendant's motion for summary judgment, concluding that plaintiff's claim is precluded under res judicata principles. Plaintiff's claim will therefore be dismissed.

Thus, plaintiff's motion for partial summary judgment (Doc. 33) is **denied as moot**.

### IV.     CONCLUSION

For the reasons stated above, the Court **denies as moot** plaintiff's motion for partial summary judgment.  (Doc. 33).  The Court **grants** defendant's motion for summary judgment.  (Doc. 26).  Plaintiff's claim is **dismissed with prejudice** and this case can be closed.

**IT IS SO ORDERED** this 29th day of May, 2026.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa

15